UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| : | |
| : | |
| v. : | Case No. 25-CR-94 (BAH) |
| : | |
| **RICKY COREY WATKINS, JR.** : | |
| : | |
| **Defendant.** : | |

### UNITED STATES' SENTENCING MEMORANDUM

The United States of America, by and through its attorneys, the United States Attorney for the District of Columbia and undersigned counsel, hereby files its sentencing memorandum to assist the Court's consideration of the relevant issues. As noted below, Defendant Rickey Corey WATKINS Jr. ("WATKINS") faces an advisory Guidelines range of 46 months to 57 months' imprisonment. For the reasons articulated below, the United States respectfully recommends that the Court impose a sentence of **48** months' imprisonment to be followed by 36 months' supervised release.

### PROCEDURAL HISTORY AND RELEVANT FACTS

On March 19, 2025, MPD Officers McCourt and Burke were on patrol in MPD's Third District, dressed in full police uniform operating marked, MPD cruiser number "1307." At approximately 7:44pm, Officers McCourt and Burke responded to a call for service to the Harrison Recreation Center, located at 1330 V Street, Northwest, based on reports that two individuals were riding a dirt bike in that area. The Harrison Recreation Center is comprised of a building, a playground area, a basketball court, and a baseball field.

Upon arriving at that location, Officers McCourt and Burke observed two men riding a yellow dirt bike exiting the park and coming onto the public sidewalk. Officers McCourt and Burke

1

stopped the men and detained them for Operating a Dirt Bike in a Public Space. The driver of the dirt bike was later identified as WATKINS.



WATKINS claimed to have sustained an injury while he was being detained, and D.C. Fire and Emergency Medical Services ("DCFEMS") responded and examined him. WATKINS was placed under arrest for Operating a Dirt Bike in a Public Space and was asked whether or not he wanted to go to the hospital. When WATKINS stated that he wanted to go to the hospital, he was told that DCFEMS would have to search him before putting him in an ambulance. At that point, while he was still detained in handcuffs, WATKINS stood up and fled on foot.



2

Officers McCourt and Burke, as well as other officers who had come to the scene to assist, immediately gave chase. Officer McCourt was close behind WATKINS when they turned southbound, entering the 2000 block of 13th Street, Northwest. While running on that block, Officer McCourt saw WATKINS reach onto his body and remove a tan in color object that Officer McCourt immediately recognized to be a handgun. Officer McCourt then saw WATKINS throw the handgun and keep running. Officer McCourt yelled the word "gun" multiple times as recorded on his BWC; visible in this still shot is Officer McCourt pointing to where he saw the gun as he continued to chase Defendant down 13th Street, Northwest.



Officer Burke stopped with the firearm, and can be heard on his BWC saying "gun gun gun," and then "I've got the gun, keep going" as other officers attempted to catch up to WATKINS and Officer McCourt.



Officer Burke then radioed "weapon recovery, 13th Street." The firearm can be seen in Officer Burke's BWC as he stood over it. Officer Burke then used a gloved hand to recover the firearm.



Meanwhile, Officer McCourt continued to give chase as WATKINS Crossed U Street, Northwest, and entered an alleyway between U Street and Wallach Place, Northwest. At the approximate midpoint of the alleyway, WATKINS hid behind a pickup truck that was parked between two buildings. As is visible in the following still shot, the pickup truck was occupied by a man sitting in the driver's seat.



Multiple officers then arrived at Officer McCourt's location and together they were able to effect WATKINS's arrest. WATKINS' approximate flight path (red arrows), the location of his arrest (red circle), and the approximate location of the firearm's recovery (yellow circle) are all shown on the map below.




5

The firearm was later determined to be a Glock, Model 19X, 9mm semi-automatic handgun bearing serial number BYFZ501. The Glock 19X was loaded with one round in the chamber and 14 rounds in a 17-round capacity magazine and fitted with a laser site attachment.



WATKINS was placed under arrest. An NCIC query revealed that WATKINS had prior felony convictions in D.C. Superior Court Case Numbers 2010 CF2 000924 and 2012-CF2-007828. WATKINS was charged by criminal complaint in this Court on March 20, 2025. (Docket Entry 1). On March 27, 2025, WATKINS consented to pretrial detention, and he was charged by Indictment on April 3, 2025. Minute Order, 3/27/25; (Docket Entry 10). WATKINS pled guilty on May 30, 2025, to the sole count in the Indictment pursuant to a written plea agreement. Minute Entry, 5/30/25; (Docket Entries 18, 19). Sentencing is set for September 19, 2025.

## ANALYSIS

**I.      UNITED STATES' ANALYSIS OF THE SENTENCING GUIDELINES**

Even though the Sentencing Guidelines are advisory, United States v. Booker provides that sentencing courts "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005) (cited in United States v. Brown, 892 F.3d 385, 399 (D.C. Cir. 2018)). The Supreme Court has noted that the Guidelines provide "the starting point and the initial benchmark" for sentencing. Gall v. United States, 590 U.S. 38, 49 (2007); see also United States v. Dorcely, 454 F.3d 366, 375 (D.C. Cir. 2006) ("Booker has not changed how the Guidelines range is to be calculated."). Moreover, the Guidelines' recommended sentencing range will ordinarily "'reflect a rough approximation of sentences that might achieve [18 U.S.C.] § 3553(a)'s objectives.'" Kimbrough v. United States, 552 U.S. 85, 108-09 (2007) (quoting Rita v. United States, 551 U.S. 338, 347-50 (2007)); see also Dorcely, 454 F.3d at 376 (noting that "a sentence within a properly calculated Guidelines range is entitled to a rebuttable presumption of reasonableness").

To calculate a Guidelines sentence, the Court must first select the applicable offense guideline and then select the base offense level within that applicable offense guideline. United States v. Flores, 912 F.3d 613, 616 (D.C. Cir. 2019). As the D.C. Circuit has long held, this inquiry must include an evaluation of all relevant conduct that could affect the Guidelines calculation.

> In the post-Booker world, the court must calculate and consider the applicable Guidelines range but is not bound by it. Under the Guidelines, "the sentencing range for a particular offense is determined on the basis of all 'relevant conduct' in which the defendant was engaged and not just with regard to the conduct underlying the offense of conviction." Witte v. United States, 515 U.S. 389, 393 (1995) (citing U.S.S.G. § 1B1.3). Section 1B1.3 details the conduct the sentencing court may consider in determining the applicable Guidelines range and the commentary to that section states, "Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination

7

of the applicable guideline sentencing range." U.S.S.G. § 1B1.3, comment., backg'd.

Dorcely, 454 F.3d at 375.

### A.  Calculation of WATKINS' Criminal History Category

WATKINS was convicted of Carrying a Pistol Without a License in D.C. Superior Court Case Number 2010 CF2 924, and sentenced to serve 24 months' incarceration. This offense warrants 3 criminal history points pursuant to U.S.S.G. § 4A1.1(a).

WATKINS was convicted of four counts of Assault with a Dangerous Weapon, one count of Aggravated Assault While Armed, one count of Second Degree Cruelty to Children, and two counts of Destruction of property in D.C. Superior Court Case Number 2012 CF2 7828. This offense warrants 3 criminal history points pursuant to U.S.S.G. § 4A1.1(a). WATKINS was on parole for this offense when he was arrested in this case.

Accordingly, WATKINS has six criminal history points, placing him in Criminal History Category ("CHC") III.

### B.  Calculation of WATKINS' Advisory Guidelines Range

The United States calculates WATKINS' Offense Level as follows:

Count One
| | | |
|---|---|---|
| U.S.S.G. § 2K2.1(a)(3) | Base Offense Level | 22 |
| U.S.S.G. § 3C1.2 | Reckless Endangerment/Flight | +2 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | - 3 |
| | **Total:** | **21** |

Offense Level 21 in Criminal History Category III calls for an advisory guideline range of 46 to 57 months' imprisonment.

#### i.  Base Offense Level

WATKINS' base offense level is properly calculated at 22, because – as outlined above – this offense involved a semi-automatic firearm that was capable of accepting a high-capacity

8

magazine, and WATKINS has a prior conviction for a crime of violence in D.C. Superior Court Case Number 2012 CF2 7828. U.S.S.G. § 2K2.1(a)(3). Defendant's conviction for D.C. Aggravated Assault While Armed constitutes a "crime of violence" under U.S.S.G. § 2K2.1, which adopts the definition of "crime of violence" from § 4B1.2(a). D.C. aggravated assault qualifies as a crime of violence under both the "elements clause," U.S.S.G. § 4B1.2(a)(1), and the "enumerated offense clause," § 4B1.2(a)(2). See, e.g., United States v. Lucas, No. 20-cr-218 (TJK) (D.C.C. Feb. 9, 2022) (ECF 44) (Tr. 52-62) (holding that D.C. aggravated assault qualifies under the elements clause, without reaching enumerated clause).

Under D.C. law, "[a] person commits the offense of aggravated assault if: (1) By any means, that person knowingly or purposely causes serious bodily injury to another person; or (2) Under circumstances manifesting extreme indifference to human life, that person intentionally or knowingly engages in conduct which creates a grave risk of serious bodily injury to another person, and thereby causes serious bodily injury." D.C. Code § 22-404.01(a). Although there is no statutory definition of "serious bodily injury," the D.C. Court of Appeals has defined it "as 'bodily injury that involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ or mental faculty.'" White v. United States, 207 A.3d 580, 588 (D.C. 2019) (quoting Nixon v. United States, 730 A.2d 145, 149 (D.C. 1999)).

The defendant's aggravated assault conviction constitutes a "crime of violence" under the U.S.S.G. § 4B1.2(a)(1)'s elements clause because it "has as an element the use, attempted use, or threatened use of physical force against the person of another." The D.C. statute at issue provides that an aggravated assault can be committed by (1) purposely causing serious bodily injury to another person, (2) knowingly causing serious bodily injury to another person, or (3) "[u]nder

circumstances manifesting extreme indifference to human life," intentionally or knowingly engaging in conduct that both "creates a grave risk of serious bodily injury to another person" and does, in fact, cause serious bodily injury. Both categories (1) and (2) clearly satisfy the elements clause. As the Supreme Court has recently recognized, "it is impossible to deliberately cause physical harm without the use of physical force." Delligatti v. United States, 145 S. Ct. 797, 805 (2025); see also, e.g., United States v. Robles, 855 F. App'x 804, 811 (3d Cir. 2021) ("The state indictment and plea form collectively indicate that Torner pled guilty to 'purposely or knowingly' causing or attempting to cause serious bodily injury to another person. Accordingly, the District Court properly concluded that Torner's aggravated assault conviction was a crime of violence for sentencing purposes.").

Conduct under category (3) also qualifies because it requires that the defendant actually cause serious bodily injury with a mental state of "extreme recklessness." In Borden v. United States, the Supreme Court held that offenses with a *mens rea* of ordinary recklessness do not satisfy the elements clause because "[t]hey do not require . . . the active employment of force against another person." 141 S. Ct. 1817, 1834 (2021) (plurality op.). But Borden expressly reserved judgment on mental states between recklessness and knowledge, "often called 'depraved heart' or 'extreme recklessness'": "We have no occasion to address whether offenses with those mental states fall within the elements clause." Id. at 1825 n.4; see also id. at 1856 n.21 (Kavanaugh, J., dissenting) ("In my view, crimes committed with extreme recklessness, such as depraved-heart murder, should obviously still qualify as predicate offenses under ACCA, even after today's decision. And indeed, counsel for Borden forthrightly acknowledged at oral argument that extreme recklessness crimes, such as depraved-heart murder, can still suffice under ACCA.").

10

As the D.C. Circuit has recognized, after Borden, "[t]he circuit courts considering 'extreme' or 'depraved heart' recklessness . . . have concluded that elevated recklessness satisfied the elements clause." United States v. West, 68 F.4th 1335, 1340 (D.C. Cir. 2023). Indeed, all eight circuits to address the issue have found that "extreme recklessness" satisfies the elements clause. See id. n.11; see also United States v. Delgado, ___ F.4th ___, ___, 2025 WL 2458100 (2d Cir. Aug. 27, 2025); United States v. Kepler, 74 F.4th 1292, 1303-12 (10th Cir. 2023); Janis v. United States, 73 F.4th 628 (8th Cir. 2023); United States v. Harrison, 54 F.4th 884 (6th Cir. 2022); United States v. Manley, 52 F.4th 143 (4th Cir. 2022); Alvarado-Linares v. United States, 44 F.4th 1334 (11th Cir. 2022)); United States v. Begay, 33 F.4th 1081 (9th Cir. 2022) (en banc); United States v. Báez-Martínez, 950 F.3d 119, 127-28 (1st Cir. 2020) (anticipating Borden decision).

And the Supreme Court's recent decision in Delligatti solidifies those rulings, as Delligatti recognizes that any argument "that murder is not a crime of violence" would be "outlandish," 145 S. Ct. at 809—even though one classic form of second-degree murder is murder committed with a "(3) depraved heart (also referred to as 'reckless indifference' or 'extreme recklessness')." Baez-Martinez, 950 F.3d at 125 (citing 2 Wayne R. LaFave, SUBSTANTIVE CRIMINAL LAW § 14.1 (3d ed. 2017)).

That circuit consensus on "extreme recklessness" flows directly from the reasoning in Borden. The Borden plurality used a hypothetical speeding motorist to describe the difference between the various mental states. A knowing driver who "sees a pedestrian in his path but plows ahead anyway, knowing the car will run him over" has "use[d] . . . physical force against the person of another": he has "consciously deployed the full force of an automobile at another person," even if he did not "desire" to hit the pedestrian and "he would prefer a clear road." 141 S. Ct. at 1326. By contrast, an ordinary-reckless driver "who, late to work, decides to run a red light, and hits a

11

pedestrian whom he did not see" "has not directed force at another": he "has consciously disregarded a real risk, thus endangering others," but "his fault is to pay insufficient attention to the potential application of force." Id. "Because that is so—because [the ordinary-reckless driver's] conduct is not opposed to or directed at another—he does not come within the elements clause. He has not used force 'against' another person in the targeted way that clause requires." Id.

For Borden purposes, acting recklessly "under circumstances manifesting extreme indifference to the value of human life" is much closer to knowledge ("aware[ness] that a result is practically certain") than ordinary recklessness ("consciously disregard[ing] a substantial and unjustifiable risk" that "need not come anywhere close to a likelihood"). 141 S. Ct. at 1823-24. While extreme recklessness "may not describe precisely the 'practically certain' state of 'knowing,' it comes close." Manley, 52 F.4th at 151.

The difference between ordinary and extreme recklessness, in turn, maps onto whether a defendant has "used" force "against" another person under the elements clause:

> [I]f a defendant shoots a gun into a room that he knows to be occupied and one of the occupants is killed, the defendant could be found guilty of murder because he acted not only recklessly, but with reckless indifference to human life. If, on the other hand, a defendant recklessly shoots a gun in the woods while hunting and kills another person, the defendant has merely committed manslaughter because the probability that death would result was much lower. Similarly, the vast majority of vehicular homicides, including the average drunk driving homicide, are treated only as manslaughter, but when a defendant with a blood alcohol content of .315% drives nearly 100 miles per hour in the oncoming lane of a busy thoroughfare and kills another driver in a collision, a murder conviction can result.

Baez-Martinez, 950 F.3d at 125 (cleaned up). In Borden terminology, "if the perpetrator is aware of both the presence of potential victims and the very high risk of hitting them, then it is fair to say that the perpetrator has directed his actions against, or targeted, other individuals, even if he neither aims at nor consciously desires to harm them." Begay, 33 F.4th at 1098 (Murguia, C.J., concurring).

Borden also considered "context and purpose," worrying that a definition of a "violent felony" that includes ordinary recklessness would go beyond the "narrow 'category of violent, active crimes'" and sweep in crimes (like drunk driving) that reflect "mere indifference to risk" instead of "a deliberate choice of wreaking harm on another." 141 S. Ct. at 1830. The Court drew a contrast to "'[t]he quintessential violent crimes,' like murder or rape, [that] 'involve the intentional use' of force." Id. (quoting Oyebanji, 418 F.3d at 264).

With extreme recklessness, however, those considerations push exactly the opposite way. The mental state of "recklessly under circumstances manifesting extreme indifference to the value of human life" is a formulation that comes from the Model Penal Code, confined to the offenses of second-degree murder ("depraved heart") and aggravated assault. See Model Penal Code §§ 210.2(1)(B), 211.1(2)(a). And so rejecting extreme-recklessness crimes risks excluding the "quintessential violent crime" of murder. Borden, 141 S. Ct. at 1830; see also Manley, 52 F.4th at 151 ("murder is obviously among the most violent of crimes"); Alvarado-Linares, 44 F.4th at 1345 ("Malice murder meets the common, ordinary definition of a violent crime."); Baez-Martinez, 950 F.3d at 128 (similar). Further, Congress's purpose "to address the special danger created when a particular type of offender—a violent criminal—possesses a gun," Borden, 141 S. Ct. at 1830, would be ill-served by a rule that disregards a person's convictions for aggravated assault and murder. They are "the stuff of armed career criminals." Id. at 1834. As the Supreme Court recently summarized, "[t]he elements clause is . . . the natural home for murder and other prototypical violent crimes, and the unreasonableness of excluding such crimes from the elements clause is an additional reason to read the statute as we do." Delligatti, 145 S. Ct. at 809 (emphasis added). Because the elements clause includes extreme recklessness, D.C. aggravated assault is a crime of violence under U.S.S.G. § 4B1.2(a)(1)'s elements clause.

13

Separately, D.C. aggravated assault qualifies as a crime of violence under U.S.S.G. § 4B1.2(a)(2)'s "enumerated offense" clause. In that provision, the Sentencing Commission enumerated "aggravated assault" as one of the offenses that constitutes a crime of violence. To determine whether D.C. aggravated assault qualifies as a crime of violence under the enumerated-offense clause, the court "compares the elements of the defendant's crime of conviction . . . with the elements of . . . the generic definition" of that offense. United States v. Crews, 2021 WL 5798033, at *8 (D.D.C. Dec. 7, 2021). "If the scope of conduct covered by the defendant's crime of conviction is broader than what the enumerated offense definition would cover, the 'crime of violence' sentencing enhancement is not valid under the enumerated offense clause." Id.

"To identify the elements of the generic offense, courts examine the Model Penal Code, learned treatises, and state laws." United States v. Brasby, 61 F.4th 127, 136-37 (3d Cir. 2023). The Model Penal Code states that a defendant commits aggravated assault if he or she "(a) attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly, <u>or recklessly under circumstances manifesting extreme indifference to the value of human life</u>, or (b) attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon." Model Penal Code § 211.1(2) (emphasis added). Additionally, the Model Penal Code defines a "serious bodily injury" as a "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." Model Penal Code § 210.0(3).

Most treatises on aggravated assault surveyed by the Third Circuit in a recent opinion likewise specify that aggravated assault can be committed through "at least a heightened degree of recklessness." Brasby, 61 F.4th at 137-38. The Third Circuit's recent survey of state laws confirmed the Model Penal Code's definition: "the majority of states with aggravated assault

14

statutes allow for a conviction based on causing serious bodily injury to another either recklessly or recklessly under circumstances manifesting extreme indifference to the value of human life." Id. at 140. Even broadening the scope of the search beyond statutes explicitly called "aggravated assault," "at least 31 jurisdictions punish, as a felony, causing serious bodily injury with a mental state of extreme indifference recklessness or less," whereas "just 14 jurisdictions . . . clearly require a mental state greater than extreme indifference recklessness," and "[t]he laws in six jurisdictions are harder to place." Id. at 141; see also United States v. Schneider, 905 F.3d 1088 (8th Cir. 2018) (reaching similar definition of generic aggravated assault); United States v. Rede-Mendez, 680 F.3d 552, 556-57 (6th Cir. 2012) (same).

Here, D.C. aggravated assault is no broader than generic aggravated assault as found in the Model Penal Code, learned treatises, and state statutes. Under D.C. law, aggravated assault can be committed by (1) purposely causing serious bodily injury to another person, (2) knowingly causing serious bodily injury to another person, or (3) "[u]nder circumstances manifesting extreme indifference to human life," intentionally or knowingly engaging in conduct that both "creates a grave risk of serious bodily injury to another person" and does, in fact, cause serious bodily injury. Under the Model Penal Code, aggravated assault likewise can be committed by (1) purposely causing serious bodily injury to another person, (2) knowingly causing serious bodily injury to another person, or (3) causing serious bodily injury "recklessly under circumstances manifesting extreme indifference to the value of human life." Treatises and state statutes similarly punish conduct as aggravated assault based on causing serious bodily injury while acting with a mens rea no higher than recklessness manifesting extreme indifference to human life. See Brasby, 61 F.4th at 137-41. Accordingly, D.C. aggravated assault constitutes a crime of violence under U.S.S.G.

4B1.2(a)(2)'s elements clause because the scope of conduct covered by D.C. law is no broader than what the generic-offense definition would cover.

It is true that "serious bodily injury" under D.C. law is slightly broader than "serious bodily injury" as defined by the Model Penal Code—"serious bodily injury" as defined by the D.C. Court of Appeals includes "unconsciousness" and "extreme physical pain," while the Model Penal Code's definition does not. Compare White, 207 A.3d at 588, with Model Penal Code § 210.0(3). But those aspects of the D.C. law definition nonetheless must satisfy "the 'high threshold of injury' envisioned by the legislature in authorizing a maximum prison sentence for aggravated assault that is roughly twenty times as long as that for simple assault." White, 207 A.3d at 588 (quoting Hollis v. United States,183 A.3d 737, 741 (D.C. 2018)). Moreover, when developing the D.C. definition of "serious bodily injury," the D.C. Court of Appeals looked beyond the Model Penal Code and found that its definition was "consistent with that followed in the majority of jurisdictions." Nixon, 730 A.2d at 150; see, e.g., 18 U.S.C. § 1365(h)(3) (defining "serious bodily injury" to include "extreme physical pain"); U.S.S.G. § 1B1.1 cmt. 1(M) (same); Va. Code § 16.1-283(E) (same); Owens v. State, 229 P.3d 1261, 1265 (Okla. Ct. Crim. App. 2010) (explaining that, under Oklahoma law, "serious bodily injury" has been defined to include "extreme physical pain"); Tenn. Code Ann. § 39-11-106(37) (defining "serious bodily injury" to include "protracted unconsciousness" or "extreme physical pain"); Ind. Code § 35-31.5-2-292 (defining "serious bodily injury" to include "unconsciousness" and "extreme pain"). D.C. Code aggravated assault thus falls within the generic meaning of aggravated assault.

Thus, for two separate and independent reasons, the defendant's prior conviction for conviction for Aggravated Assault While Armed qualifies as a "crime of violence" under the Guidelines.

  **ii.**    **Reckless Endangerment During Flight**

The Sentencing Guidelines provide for a two-level increase to the applicable base offense level "[i]f the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." U.S.S.G. § 3C1.2.

Any "conduct that could potentially harm a police officer or a third party is sufficiently reckless" to qualify for the enhancement. United States v. Matchett, 802 F.3d 1185,1197-98 (11th Cir. 2015). Courts have specifically held that this enhancement applies to foot chases as well as attempts to flee in a vehicle. United States v. Davidson, 933 F.3d 912, 914-15 (8th Cir. 2019) (defendant ran from police and scaled six-foot fence, creating risk for officers giving chase); United States v. Dennings, 922 F.3d 232, 235-39 (defendant ignored orders to stop and reached for handgun while running from police).

Further, Courts have specifically held that dropping a handgun while fleeing from police justifies the enhancement given both the possibility that the handgun will accidentally discharge when dropped, as well as the inherent danger of leaving a loaded firearm in an area where it might be discovered by others. Matchett, 802 F.3d at 1198 (citing Johnson v. Colt Indus. Operating Corp., 797 F.2d 1530, 15632 (10th Cir. 1986); see also United States v. Brooks, 100 F.4th 825, 833-34 (7th Cir. 2024) (dropping loaded handgun in residential area while fleeing from police warranted enhancement); United States v. Brown, 31 F.4th 39, 48-49 (1st Cir. 2022) (dropping handgun while attempting to escape is sufficient to warrant enhancement given risk of accidental discharge or recovery by third party) (citing Matchett, 802 F.3d at 1197-98); United States v. Gray, 942 F.3d 6227, 632 (3d Cir. 2019) (enhancement applied to Defendant who dropped handgun in residential neighborhood while fleeing from police).

Courts have also applied this enhancement to defendants who flee from police on foot and, in so doing, run into traffic. United States v. Stevenson, 471 F. Supp. 3d 1178, 1180-81 (D.N.M. 2020) (defendant's flight on foot into traffic "recklessly created a substantial risk of death or serious bodily injury to the pursuing officer and nearby motorists"); see also United States v. Brewster, 116 F.4th 1051, 1058-59 (9th Cir. 2024) (noting that the enhancement is justified if the defendant placed "at least one motorist at substantial risk of serious bodily injury").

WATKINS' flight from MPD officers warrants the two-level enhancement under U.S.S.G. § 3C1.2. While handcuffed, WATKINS took flight on foot from officers south on the 2000 block of 13th Street, Northwest, refusing Officer McCourt's commands to stop, through a residential neighborhood adjacent to the Harrison Recreation Center. While running, WATKINS reached into his waistband. After the handgun fell from WATKINS' waistband, he continued to run – crossing U Street, Northwest – and entering an alleyway between U Street and Wallach Place, Northwest, where he was ultimately arrested by Officer McCourt. WATKINS' actions recklessly created a substantial risk of death or serious bodily injury to Officer McCourt, the residents of the 2000 block of 13th Street, Northwest, and the motorists on U Street.

## II.     UNITED STATES' ANALYSIS OF THE STATUTORY SENTENCING FACTORS

18 U.S.C. § 3553(a) requires the Court to impose a sentence that is sufficient, but not greater than necessary, to comply with certain enumerated sentencing factors. Among the factors that the court must consider are "(1) the nature and circumstances of the offense and the history and characteristics of the defendant;" and the need for the Court's sentence to:

(A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)  to afford adequate deterrence to criminal conduct;
(C)  to protect the public from further crimes of the defendant; and
(D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

Id.  The United States respectfully submits that the statutory sentencing factors weigh in favor of a Guidelines sentence in this case.

WATKINS, a convicted felon who was on parole for numerous offenses – including Assault with a Dangerous Weapon and Aggravated Assault While Armed – was carrying a 9mm Glock handgun that was fitted with both an extended magazine and a laser sight.  The increased ammunition capacity and accuracy provided by those accessories transformed what might otherwise be argued to be a "self-defense" weapon into a killing machine.  The seriousness of this offense, and the obvious need to both punish and deter this conduct, would be difficult to overstate.  Likewise, there is a clear need to protect the public from future crimes committed by WATKINS and deter him from committing future crimes given his failure to rehabilitate his conduct to date.

### III.     UNITED STATES' SENTENCING RECOMMENDATION

For all of the reasons outlined above, the United States respectfully submits that Defendant should be sentenced to a term of **48** months' imprisonment to be followed by a 36-month term of supervised release. The United States requests that the conditions of Defendant's supervised release include the requirement that he be screened for the Re-Entry Court Program, and that he be ordered to participate if he is deemed eligible for that program.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By:    */s/ James B. Nelson*
JAMES B. NELSON
D.C. Bar No. 1613700
Assistant United States Attorney
Violent Crime and Narcotics Trafficking Section
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-6986
james.nelson@usdoj.gov