**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Cr. No. 25-cr-94 (BAH)** |
| | ) | |
| **RICKY WATKINS** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**AMENDED SENTENCING MEMORANDUM**</u>

Ricky Watkins, through undersigned counsel, respectfully submits this memorandum requesting that the Court consider his entire life and the various legal arguments made in this sentencing memorandum in determining a fair and just sentence. To begin, Mr. Watkins' guideline range should be substantially lower than what was determined by Probation. In addition, given the challenging upbring that Mr. Watkins has faced and his motivation to turn around his life for his infant daughter, counsel respectfully submits that a sentence of twenty-one months is sufficient but no greater than necessary.

### <u>Background</u>

Mr. Watkins has pleaded guilty 18 U.S.C. §922 (g), in this case to the offense of Unlawful Possession of a Firearm. Though he presents much older, he is a thirty-four year old man who raises an infant daughter with his wife, Sierra Gladney. This case has caused conflict with his wife but she has forgiven him and agreed that the best path forward is for the family to be together. He desires to be a positive role model for his daughter – though he now has a close relationship with his father, the lack of a father figure in his own formative years made a lasting negative impact that he will not impose upon his own child.

In many ways, Mr. Watkins has been prone to a combination of good and bad luck and

March 2025 continued that trend. On the one hand, he was given an opportunity to work at WMATA as a mechanic, a job that fit skills that he learned while incarcerated and paid more than he thought he would earn so soon after his release. But because he made the poor choice of showing off his dirtbike to his nephew on a baseball field in a residential area. The police stopped and arrested him and they recovered the gun that fell out of his waistband.

Mr. Watkins did not have the gun for any offensive purposes that day – he had it because when he brought valuable items outside in Southeast DC, he was prone to the same robberies and carjackings by out of control youths as the rest of the District. There was no indication that he had it for any other purposes – he was not seen brandishing the gun, holding the gun, pointing the gun or using it for any particular purpose. Still, he recognizes that mere possession of a firearm is a significant crime for a felon like him. He thus took full responsibility for his actions quickly.

## ARGUMENT

### Sentencing Law

Twenty years ago, the Supreme Court held that "the Federal Sentencing Reform Act of 1984…ma[de] the Guidelines effectively *advisory*." *United States v. Booker*, 543 U.S. 220, 245 (2005). Under *Booker*, the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing. " *Id.* at 264 (citing *See* 18 U.S.C. §§ 3553(a)(4), (5)). While holding that district courts should still consider the Guideline calculations and ranges for sentencing purposes, the Supreme Court in *Booker* held that courts must consider all the purposes of sentencing set forth in 18 U.S.C. § 3553(a). Overall, in light of *Booker*, courts must treat the Guidelines as one among several of the sentencing factors.

Pursuant to 18 U.S.C. § 3553(a) – as explicitly endorsed by the Supreme Court in *Booker*

– sentencing courts should consider the need for the sentence imposed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner

Several years after *Booker*, the Supreme Court made clear that the "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2).

In determining such a sentence, the sentencing court must consider the United States Sentencing Guidelines, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to serve the purposes of sentencing, the kinds of sentences available, the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense. *Id*. § 3553(a)(1). In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth. *Id.* § 3661.

Congress has further provided that:

[t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall

consider the factors set forth in Section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation*.

18 U.S.C. § 3582(a) (emphasis added).  With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]."  *Id*. § 3553(a) (emphasis added).

Since *Booker*, the Supreme Court reaffirmed that the Sentencing Guidelines are merely one factor to be considered by district courts when fashioning a reasonable sentence and that the Sentencing Guidelines are not to be weighed more heavily than other sentencing factors. *See Rita v. United States*, 551 U.S. 338 (2007); *Gall v. United States*, 552 U.S. 38 (2007).  A sentencing court shall not simply presume that a sentence within the Guideline range is automatically reasonable or that a sentence within the Guideline range is more reasonable than a sentence outside of the Guideline range. *Rita*, 551 U.S. at 338; *Gall*, 552 U.S. at 46. The sentencing court further shall not presume that a sentence outside of the Guidelines range is unreasonable.  *Id.*  By considering the Sentencing Guidelines along with all of the factors set forth 18 U.S.C. § 3553(a), "the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure." *Rita*, 551 U.S. at 351.  It is critical for sentencing courts to consider all sentencing factors and to not give undue weight to the Sentencing Guidelines because, as the Supreme Court has long emphasized that "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Gall*, 552 U.S. at 52 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)); s*ee also United States v. Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at *4-5 (D. Md. Feb. 18, 2020)("But if

judges are not careful, a rote application of the Guidelines can turn what is often a life-defining moment for the defendant into a check-the-box, formulaic calculation devoid of the individualized sentencing we strive for.").

I.      **The Guidelines Calculation**

The proper guideline range for Mr. Watkins is 30 to 37 months. His offense level, with acceptance of responsibility is 17[1]. He is in Criminal History Category III (6 points).

The PSR has determined that Mr. Watkins' Base Offense Level is 22 because he was previously convicted of Aggravated Assault While Armed under the D.C. Code. The PSR contains no analysis but rather defers to the government's position. The offense level is improperly applied and his offense level should begin at 20.

Moreover, the PSR applies an additional enhancement for obstruction of justice alleging that Mr. Watkins fled. But flight is not the linchpin of the enhancement – endangering actual people is. Mr. Watkins did not endanger anyone. In fact, his actions were not unusual, within the context of an urban arrest. Running from the police, even across an empty street, is not so extraordinary or dangerous that it would justify an enhancement. It is not typically applied in this jurisdiction under these facts and should not be applied here.

A.  **The D.C. Code Aggravated Assault While Armed offense as defined when Mr. Watkins was convicted of the charge was not a crime of violence.**

Mr. Watkins' base offense level is 20 because he has not previously been convicted of a crime of violence.

---

[1] The Judiciary Sentencing Information Data from 2019-2023 shows that for individuals with an Offense Level of 17 and a CHC II, 46% were sentenced to downward departures or variances. The average length of imprisonment is 24 months and the median length of imprisonment is 27 months. These figures excludes the 8% of 922g defendants in this guideline range who received a probationary or fine-only sentence. https://jsin.ussc.gov/analytics/saw.dll?Dashboard

1. **Aggravated Assault while Armed is not a crime of violence under the elements clause.**

*Recklessness is insufficient.* This Circuit has not determined whether D.C. Aggravated Assault while Armed is a crime of a violence under the elements clause.[2]  It is not. When Mr. Watkins was convicted in 2012, the offense allowed for reckless conduct. Per *Borden v. United States*, 593 U.S. 420, 423 (2021), any offense that tolerates recklessness is not a crime of violence.

Aggravated assault while armed is the crime of aggravated assault (§ 22-404.01), plus the enhancement applicable to those who commit their offense "when armed with or having readily available" a weapon (§ 22-4502). Because the weapon need only be "readily available," it alone is insufficient to qualify this offense under the elements clause.  Instead, the relevant inquiry is the aggravated assault statute, and because it tolerates recklessness, it fails to qualify.  Prior to 2015, D.C. judges were instructing juries that they were allowed to find a defendant guilty of D.C. Aggravated Assault upon a finding that the defendant was "aware that his conduct created an extreme risk of serious bodily injury."  *Johnson v. United States*, 118 A.3d 199, 206 (D.C. 2015).  This is the very definition of recklessness.  *See Elonis v. United States*, 575 U.S. 723, 745, 135 S. Ct. 2001, 2015 (2015) (Alito, J., concurring in part and dissenting in part) ("recklessness exists 'when a person disregards a risk of harm of which he is aware'" (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) & citing Model Penal Code § 2.02(2)(c)).

Only in 2015, after the D.C. Court of Appeals issued *Johnson*, was the requirement added

---

[2] The government claims that our Circuit held that an analogous statute qualified in *United States v. West*, 68 F.4th 1335 (D.C. Cir. 2023).  But *West* explicitly did not reach the issue raised by this case, whether extreme recklessness satisfies the force clause: "The circuit courts considering 'extreme' or 'depraved heart' recklessness … have concluded that elevated recklessness salifies the elements clause.  We do not have to decide whether we agree with those decisions." *Id.* at 1340.

in the Redbook Jury Instructions for Aggravated Assault 4.103 that, in addition to disregarding the risk, the defendant must do so "under circumstances manifesting extreme indifference to human life," *i.e.*, extreme recklessness. 1 Criminal Jury Instructions for D.C. 4.103 (Comment). Because Mr. Watkins was convicted in 2013 and therefore at the time of his conviction, aggravated assault tolerated reckless conduct, this crime cannot be a predicate crime of violence under *Borden*.

  ***Extreme Recklessness is insufficient.*** Even if there is any doubt that recklessness was the standard in 2013—which, given the above, there should not be—Mr. Watkins's prior offense is not a crime of violence under the elements clause because extreme recklessness *also* does not satisfy the standard.

  The operative majority in *Borden* was split between a plurality opinion written by Justice Kagan and a concurrence written by Justice Thomas. Although they disagreed about whether the holding should be based primarily on the connotations of the word "use" or the word "against," they both agreed that the statutory language requires either a purpose to apply force or at least knowledge, to a practical certainty, that force will be applied.[3] The plurality's central point was that one does not "use" force "against" another unless that force is "consciously directed" against the victim—which requires intent or, at a minimum, knowledge that the application of force is "practically certain." 593 U.S. at 425, 430-31. And Justice Thomas explained that in his view the phrase "use of physical force" "has a well-understood meaning applying only to intentional acts designed to cause harm." *Id*. at 446 (Thomas, J. concurring) (internal quotation marks and

---

[3] In other words, the ACCA's force clause—which is identical to U.S.S.G. § 4B1.2—defines a violent felony as any felony offense that "has as an element the use, attempted use, or threatened use of physical force against the person of another.'" 18 U.S.C. § 924(e)(2)(B)(i). The plurality and the concurrence's agreed that these words do not tolerate reckless conduct, but premised their holding by relying upon either the word "use" or the word "against."

citation omitted).

While the Supreme Court had no occasion or need to address whether crimes requiring "extreme recklessness" would qualify under the force clause—and the plurality explicitly reserved that question, *see Borden*, 593 U.S. at 429 n.4—the Court's reasoning virtually compels the conclusion that extreme reckless would not qualify. This is for at least two reasons.

***First***, both the plurality and concurrence in *Borden* agreed that a "use" of force "against" an object requires more than a failure to pay sufficient attention to risk. Justice Thomas determined these words "apply[] only to *intentional* acts designed to cause harm.'" *Id*. at 446 (Thomas, J. concurring) (emphasis added). And the plurality determined that these words demand an "oppositional, or targeted definition" that requires a conscious decision and therefore "covers purposeful and knowing acts, but excludes reckless conduct." *Id*. at 432. Reckless conduct, the plurality explained, is simply "not aimed in [the] prescribed manner." A driver who runs a red light and hits an unseen pedestrian is reckless: He "consciously disregarded a real risk." *See id.* Still, the driver "has not directed force at another." *Id*. He "has not trained his car at the pedestrian understanding he will run him over." *Id*. Because "[the driver's] conduct is not opposed to or directed at another" he does not "use[] force 'against' another person in the targeted way that the clause requires." *Id*. The force clause requires "a deliberate choice of wreaking harm on another, rather than mere indifference to risk." *Id*. at 438.

Much like ordinary recklessness, extreme recklessness also does not require a "deliberate choice of wreaking harm on another"; it requires "mere indifference to risk." To be sure, extreme recklessness takes a step up the ladder of culpability from ordinary recklessness, just as ordinary recklessness takes a step up from negligence, but this additional step does bridge the categorical divide between purposeful and non-purposeful conduct—and that is the divide that the phrase

"against the person of another" renders "critical." *Id.* at 428 (quoting *Leocal v. Ashcroft,* 543 U.S. 1, 9 (2004)). In the end, extreme recklessness is still recklessness requiring a risk "far less than . . . substantial certainty." Wayne R. Lafave & Austin W. Scott, 2 *Substantive Criminal Law* § 14.4(a), Westlaw (3d ed. database updated Dec. 2021). And even toleration of a large and dangerous risk is not "a *deliberate* choice with *full awareness* of consequent harm." *Borden*, 593 U.S. at 426 (plurality op.) (emphasis added). Those who disregard a risk that their conduct will create harmful force simply cannot be said to "use," "target," or "intend" that application of force in the way that a knowing violator can. *See Borden,* 593 U.S. at 427-32. On this basis alone, extreme recklessness cannot satisfy the force clause.

 **Second**, *Borden* specifically identified drunk driving as a paradigmatic example of what does not count as a use of force under the force clause. *See id.* at 328 ("drunk driving and other crimes of recklessness, though 'morally culpable,' do not fit within 'the ordinary meaning of the term 'violent' crime.''); *see also Leocal,* 543 U.S. at 11 (noting the term "crime of violence" "cannot be said naturally to include DUI offenses"). However, it is well established that drunk driving convictions have been upheld under statutes requiring a *mens rea* of extreme recklessness.[4] Thus, finding that extreme recklessness is a sufficient *mens rea* would ensnare

---

[4] *See e.g., State v. Barstad*, 970 P.2d 324, 326 (Wash. Ct. App. 1999) (intoxicated driver who sped through red light at busy intersection causing fatal collision convicted under statute requiring "extreme indifference"), *review denied,* 137 Wash. 2d 1037, 980 P.2d 1284 (1999); *State v. Braden,* 867 S.W.2d 750, 753 (Tenn. Crim. App. 1993) (intoxicated driver who took a blind curve at over eighty miles per hour causing fatal collision convicted under statute requiring "extreme indifference to the value of human life"); *Allen v. State,* 611 So.2d 1188, 1189-90 (Ala. Crim. App. 1992) (intoxicated driver involved in car crash involving fatal collision convicted "under circumstances manifesting extreme indifference to human life"); *State v. Woodall,* 744 P.2d 732, 736 (Ariz. Ct. App. 1987) (intoxicated driver who crossed the center line while speeding causing fatal collision convicted under statute requiring "extreme indifference"); *Pears v. State,* 672 P.2d 903, 909 (Alaska App. 1983) (intoxicated driver who ran stop signs, yield signs, and traffic lights, causing fatal collision was convicted under manslaughter statute requiring "extreme indifference to the value of human life"), remanded on other grounds, 698

drunk driving offenses as "crimes of violence"—a result that the Supreme Court has explicitly rejected. *See Borden*, 593 U.S. at 438-39; *Leocal*, 543 U.S. at 13 ("Drunk driving is a nationwide problem . . . [b]ut this fact does not warrant our shoehorning it into statutory sections where it does not fit.").

The Supreme Court has recognized that the "[categorical] approach is under-inclusive by design: it expects that some violent acts, because charged under a law applying to non-violent conduct, will not trigger enhanced sentences." *Borden*, 593 U.S. at 442. Given the substantial stakes, the Supreme Court has consistently sought to avoid any interpretation that could render this term over-inclusive. *See id.* at 438-39. But a finding that D.C. aggravated assault while armed is a crime of violence would necessarily require the Court to find that extreme recklessness is a sufficient *mens rea*, which would also ensnare crimes like drunk driving—*i.e.,* crimes that the Supreme Court has consistently said plainly do not fit. Accordingly, D.C. aggravated assault while armed—even if it requires extreme reckless—is categorically not a crime of violence under the force clause because it has an insufficient *mens rea.*

### 2. Aggravated Assault while Armed is not a crime of violence under the enumerated clause.

"[T]he enumerated-offenses clause [] does not refer to whatever conduct a state happens to call 'burglary,' 'aggravated assault,' or any of the other listed offenses." *United States v.*

---

P.2d 1198 (Alaska 1985); *United States v. Merrit,* 961 F.3d 1105, 1108 (10th Cir. 2020) (upholding second-degree murder conviction under 18 U.S.C. § 1111(a), requiring extreme recklessness, based on drunk driving); *United States v. Hernandez,* No. 20-cr-324 (N.D. Okla.), Plea Agreement (ECF No. 31 at 8), and Judgment (ECF No. 40) (same); *United States v. Sheffey,* 57 F.3d 1419, 1420 (6th Cir. 1995) (same); *United States v. Fleming,* 739 F.2d 945 (4th Cir. 1984) (same); *United States v. Lemus-Gonzalez,* 563 F.3d 88, 93 (5th Cir. 2009) (applying second-degree murder enhancement to drunk driver who transported non-citizens without seatbelts at a high rate of speed, crashed, and killed two).

*Schneider*, 905 F.3d 1088, 1092-93 (8th Cir. 2018) (citing *Descamps v. United States*, 570 U.S. 254, 257 (2013); *Taylor v. United States*, 495 U.S. 575, 590–92 (1990)). "Rather, it incorporates the 'generic, contemporary' meaning of those offenses, a 'uniform definition independent of the labels employed by the various States' criminal codes.' *Taylor*, 495 U.S. at 592, 598.

> ***Recklessness is insufficient.*** One source for the mental state attached to aggravated assault is the Model Penal Code, which requires at least an extreme recklessness *mens rea*. *See* MPC § 211.1(2). While this Court need not find the MPC dispositive, *see United States v. Garcia-Jimenez,* 807 F.3d 1079, 1086 (9th Cir. 2015) ("as we have emphasized, the Model Penal Code, while a helpful tool in the categorical analysis, does not dictate the federal generic definition of a crime"), even under its inclusion of extreme recklessness, Mr. Watkins's prior offense does not qualify.  Mr. Watkins's prior D.C. aggravated assault conviction from 2012 permitted a lesser *mens rea*, as discussed *supra*, and therefore is overbroad and not a match with this generic definition.  Thus, this offense is not a crime of violence.

> ***Extreme recklessness is insufficient.*** Even if there is any doubt that recklessness was the standard in 2013—which, given the above, there should not be—Mr. Watkins's prior offense is not a crime of violence under the enumerated clause because "a mens rea of extreme indifference recklessness is *not* sufficient to meet the federal generic definition of aggravated assault." *Garcia-Jimenez,* 807 F.3d at 1085 (emphasis in original) (eexplaining that "[t]he weight of authority—approximately two-thirds of the states, the common law, federal law, and at least one treatise, as compared to the Model Penal Code and one-third of the states—establishes that the federal generic definition of aggravated assault does not incorporate a mens rea of extreme indifference recklessness."). Therefore, because the generic definition of aggravated assault requires more than extreme indifference, even D.C. aggravated assault that permits extreme

recklessness fails to qualify as a crime of violence under the enumerated clause.

**B. The Reckless Endangerment Enhancement under 3C1.2 does not apply**

Probation applies the reckless endangerment enhancement and adds two levels to Mr. Watkins' offense level.  As a threshold matter, Probation makes an incorrect factual conclusion by relying upon police reports, rather than the Statement of Offense.  Mr. Watkins did not "pull[] a loaded firearm and drop[] it on the sidewalk" PSR at ¶20 and Probation has no evidence to support that conclusion.  Handcuffed behind his back while running, the firearm fell from Mr. Watkins' person.  ECF No. 19 at 3.  The firearm fell from his pants but not because Mr. Watkins tried to discard it, it was because he couldn't control it while running.  Probation has no evidence to conclude otherwise and has provided none to the Court.

The government argues that the enhancement applies because Mr. Watkins ran into the street while fleeing police.  But the government does not articulate how his actions created a "***substantial***" risk of "***death or bodily injury***" to another person.  U.S.S.G. §3C1.2.  But Mr. Watkins runs into the street for no more than four seconds and no other person is visible anywhere within those four seconds.  There is no moving traffic during this time period.

 

The chase and "drop" by defendants is a common fact pattern in 922(g) cases in this jurisdiction but Probation does not point to the regular application in District Court cases.  That is because the vast majority of cases reporting the application of 3C1.2 involve car chases that pose actual danger of serious injury or death.  Application to these common and mundane facts

would create an unwarranted sentencing disparity within the jurisdiction.

II.    **The Appropriate Sentence is twenty-one months plus two years of supervised release.**

When sentencing a defendant, the Court must treat the Guidelines "as one factor among several" that § 3553(a) requires the Court to consider. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). Once the Court correctly calculates the sentence that the Guidelines recommend, the Court must then "make an individualized assessment," considering the remaining factors set forth in § 3553(a). *Gall v. United States*, 552 U.S. 38, 50 (2007). Because the Guidelines merely reflect a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve § 3553(a)'s objectives," *Booker* and § 3553(a) require the Court to tailor an individualized sentence that actually does achieve § 3553(a)'s objectives in the case before it. *Rita v. United States*, 551 U.S. 338, 348, 350 (2007). This Court should not presume that a Guidelines sentence is reasonable and should, instead, consider whether or not the applicable Guidelines sentence properly reflects § 3553(a) considerations and whether "the case warrants a different sentence regardless." *Id.* at 351. Indeed, "it remains the judge's duty to tailor every sentencing to the case and defendant at hand," regardless of the guidelines range. *United States v. Sabillon-Umana*, 772 F.3d 1328, 1330 (10th Cir. 2014) (Gorsuch, J.). Recently, a U.S. District Court Judge explained the following:

> During the sentencing hearing, the lawyers and the judge discuss the appropriate sentence, often at great length, but after the judge announces a decision, that judge, the lawyers, and the staff move on to the next case; the hearing and outcome soon fade into distant memory. Meanwhile, for the defendant, the torture of a monotonous existence begins, while life for his family moves forward without him. For him, every day, month and year that was added to the ultimate sentence will matter. The difference between ten and fifteen years may determine whether a parent sees his child graduate from high school; the difference between ten and fifteen months may determine whether a son sees his sick parent before that parent passes away; the difference between probation and fifteen days may determine whether the defendant is able to maintain his employment and support

13

his family. *Thus, it is crucial that judges give careful consideration to every minute that is added to a defendant's sentence. Liberty is the norm; every moment of incarceration should be justified.*

*United States v. Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at *3-4 (D. Md. Feb. 18, 2020) (emphasis added).

As set forth above, the applicable Sentencing Guidelines range is 30 to 37 months.

## A. Mr. Watkins' Guideline Range is Overstated

Mr. Watkins' guideline range is overstated because it is substantially elevated for possession of a high capacity magazine. But Mr. Watkins had the ***standard*** magazine for one of the country's most popular firearms. The firearm he possessed had a magazine that had a maximum capacity of 17 bullets. The firearm he possessed, a Glock 19X is a variant of the Glock 19 9mm, commonly known to be the most popular handgun and "easily the most popular of the Glock designs and continues to be the number one option for Glock."[5] The standard magazine for the Glock 19X carries 17 rounds, the same magazine used in this case.

https://us.glock.com/en/pistols/g19x.

Without the large capacity magazine category, Mr. Watkins' Base Offense Level would be 14. His guideline range after acceptance of responsibility would be 15-21 months.

## B. The History and Characteristics of Mr. Watkins

Mr. Watkins is a 34 year old man and the father to a new baby girl. He is close to his mother and his maternal relatives and has been trying to rebuild his life for his new family. He is a loving and doting father whose only bright moments over the past several months have been when he hears the voice of his baby daughter. Though his wife has brought his daughter to

---

[5] See e.g. https://www.crossbreedholsters.com/blog/the-best-selling-handguns-of-2023/#:~:text=Glock%2019,best%2Dselling%20handguns%20of%202023.

court, social visits are no longer available at the Jail and his time away from his family has taken a significant toll on him.

Mr. Watkins has one significant conviction.  While that conviction is, on its face, violent, Mr. Watkins was convicted for being on the scene during a shooting and being in a car with the shooters and firearms.  There was no evidence that he fired the gun and critically, was acquitted for the D.C. Code equivalent of the 924(c) charge associated with the offense, that is, Count Two, Possession of a Firearm During a Crime of Violence.  He was also acquitted of Count 23, Unlawful Possession of a Firearm and Count 24, Carrying a Pistol Without a License.

It should also be noted that Mr. Watkins has been detained at the D.C. Jail at a time when conditions at the jail are beginning to deteriorate once again.  Stabbings have begun to become more frequent and counsel can report can increase in reports of poor conditions and frequent lockdowns.  Mr. Watkins asked counsel to proceed to his sentencing hearing, even if it meant that a memorandum was not submitted on his behalf.  In his words, "I need to get out of here as soon as possible.  One week in this place is worse than four months in the feds."

In fact, the Office of the D.C. Auditor, in conjunction with the Council for Court Excellence, reported disturbing findings about the D.C. Jail that show that all of the worst problems have persisted and called for "immediate replacement."  *Urgent Need for New D.C. Jail*, Office of the D.C. Auditor, May 28, 2025 at 3, found at https://cdn.prod.website-files.com/659c0df344c9c8325dd821ca/6837197775af1c53f8f34cf0_JailUpdate_Web_v5.pdf.

Among the findings are:

- People die at 3x a higher rate than U.S. average

- People overdose 10x the rate of than U.S. average

- 400 documented use of force incidents

15

- 11.1% of residents in restrictive housing (almost twice the national average)

- $30 million spent on overtime, illustrating understaffing

- 1595 maintenance reports posing ***immediate*** health and safety risks

- 76 incidents of drugs recovered

- 148 times Narcan was administered

*Id.* at 3.

- Healthy temperatures are not maintained

- Clean and safe conditions are not maintained.  Parasites, vermin and mold are not controlled

- Approximately 70% of residents had an "identified mental health issue" but the majority did not have services available to them

- 37% of mental health support positions were not filled

*Id.* at 9-11.

## C.  The Nature and Circumstances of the Offense

Possession of a firearm is not a violent offense, as a matter of fact or law, as "[n]either the act of possessing a weapon nor the fact of being a felon is in itself a crime of violence." *United States v. Gloster*, 969 F. Supp. 92, 98 (D.D.C. 1997); *see also Rehaif v. United States*, 139 S. Ct. 2191, 2197 (2019)("possession of a gun can be entirely innocent."); *Johnson v. United States*, 135 S. Ct. 2551, 2563 (2015) (J. Thomas, concurring)("Under conventional principles of interpretation and our precedents, the offense of unlawfully possessing a short-barreled shotgun does not constitute a "violent felony" under the residual clause of the Armed Career Criminal Act (ACCA)."); *Staples v. United States*, 511 U.S. 600, 611 (1994).  Therefore, imprisonment for the purpose of incapacitation is similarly not necessary or warranted.

Nor is possession of a firearm a crime of violence[6]  In 2018, 21% of this District's court docket were felon in possession cases,[7] compared to 10% nationwide.[8]  Mr. Watkins' firearm was inside his waistband but there is no evidence that he ever pulled out the gun, fired the gun or brandished the gun.  His conduct did not involve violence or involvement in a drug ring.  He is not a member of a gang or a leader of a drug organization.  It is true that the firearm fell from his person as he ran, but that was unintentional.

### D.  The Need for the Sentence Imposed

18 U.S.C. § 3553(a) directs the Court to consider four objectives of federal sentencing to impose a sentence that is "sufficient, but not greater than necessary" to achieve those goals.  The first purpose is to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).  Mr. Watkins accepted responsibility for his actions and is sincere in his desire to start a new life. He is motivated to improve himself and succeed as a father, a husband, and a member of our community.

Another purpose of sentencing is to "afford adequate deterrence." *Id.* at § 3553(a)(2)(B). While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence shows that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect."  *Five Things About Deterrence*, Nat'l Inst.

---

[6] "The federal court for the District handled 392 criminal cases of all kinds in 2018, including 83 felon-in-possession gun cases and 16 gun-related interstate robbery cases, according to court records and prosecutors." Washington Post Article, also available at https://www.washingtonpost.com/local/legal-issues/us-to-prosecute-districts-armed-ex-convicts-in-federal-court-in-surge-against-gun-violence/2019/02/05/1f518926-2363-11e9-90cd-dedb0c92dc17_story.html (last viewed on March 9, 2020).

[7] See footnote 1, supra.

[8] Nationwide, gun possession offenses represented approximately 10% of the crimes reported to the U.S. Sentencing Commission in FY 2018.  See U.S. Sentencing Commission Quick Facts Felon in Possession FY 2018, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Felon_In_Possession_FY18.pdf (last viewed March 9, 2020).

Justice, U.S. Dep't of Justice (May 2016) at 1-2.  Research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime."  *Id.* (emphasis in original).  Significantly, "the crime prevention benefit falls far short of the social and economic costs," *id.* at 2, especially in light of the fact that U.S. Sentencing Commission "research has demonstrated that reductions to sentence length and time served do not harm public safety," *Transforming Prisons, Restoring Lives*, Charles Colson Task Force on Federal Corrections, Urban Inst. (Jan. 2016) at 21.  *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardoza J. Conflict Resolution 421, 447-48 (2007) ("Certainty of punishment is empirically known to be a far better deterrent than its severity.

### E.  A Sentence Below the Guideline is Not an Unwarranted Sentencing Disparity

This Court must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Whether any difference among sentences is warranted or unwarranted depends on the individual circumstances of each case and their relationship to the purposes of sentencing. "Unwarranted disparity is defined as different treatment of *individual* offenders who are similar in relevant ways, or similar treatment of *individual* offenders who differ in characteristics that are relevant to the purposes of sentencing." U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* 113 (2004).

Over the last five years, courts have been increasingly imposing non-government

sponsored below guideline sentences in firearm cases.  *See* Quick Facts, Felon in Possession of a Firearm  https://www.ussc.gov/research/quick-facts/section-922g-firearms, In 2023, courts imposed non-government sponsored below guideline sentences in nearly 36 percent of these cases.  *Id.*  Of those offenders who received a non-government sponsored below guideline sentence, the average reduction was approximately 36%.  *Id.*

This District has followed suit.  In the past five years, (2019-2023), the average sentence for a 922(g) defendant in CHC III is 24.56.  The median sentence is 21.[9]

In addition to the below guideline sentences that have been imposed, the U.S. Sentencing Commission (U.S.S.C.) has also identified stark racial discrepancies in sentences that cannot be attributed to differences in criminal history or crime characteristics.  The U.S.S.C. attributes a significant amount of the discrepancy to judicial discretion, finding that the court grants White defendants sentences that are below their guideline range at a higher rate than Black defendants.  According to the U.S.S.C., "Black male offenders received longer sentences than similarly-situated White male offenders" by an average of 13.4 percent.  *See* U.S. Sentencing Comm'n, DEMOGRAPHIC DIFFERENCES IN SENTENCING: AN UPDATE TO THE 2012 *BOOKER* REPORT, 2 (2023), found at https://www.ussc.gov/research/research-reports/demographic-differences-sentencing.  Black men were 23.4 percent less likely than White men to receive probationary sentences.  For firearms offenses Black men were a whopping 40.4 percent less likely to receive a probationary sentence than a White man.

**F.  U.S.S.G. § 2K2.1 Does Not Embody § 3553(a) Considerations or Result in Sentences That Might Achieve § 3553(a)'s Objectives.**

---

[9] The data used for this analysis were extracted from the U.S. Sentencing Commission's "Individual Datafiles" spanning fiscal years 2018 to 2023.  The Commission's "Individual Datafiles" are publicly available for download on its website. U.S. Sent'g Comm'n, Commission Datafiles, https://www.ussc.gov/research/datafiles/commission-datafiles.

When the Guidelines were first promulgated in 1987, to create a guideline for unlawful firearm possession, the Sentencing Commission attempted to "synthesiz[e] a coherent rationale that generally explain[ed] and [was] reasonably consistent with current sentencing practice." USSC, *Supplementary Report on The Initial Sentencing Guidelines and Policy Statements*, 18 (1987). The Commission acknowledged that there were not enough statistically-significant patterns for sentencing prohibited firearm possession to create a clear guideline, noting that its "detailed statistical analyses . . . were of little value in explaining or rationalizing current sentences." *Id*. Although the Commission found that pre-Guidelines sentences had statistically-irrelevant ranges likely because of "the wide variety of circumstances under which these offenses occur," the Commission found that the "*actual or intended use* of the firearm was probably the most important factor in determining the sentence." U.S.S.G. § 2K2.1, cmt. background (1987). The Commission created guideline § 2K2.1 with a base level of 9 points, reduced to 5 if the firearm was possessed for lawful sporting use, or enhanced if the firearm was used in another offense. *See* U.S.S.G. § 2K2.1(a) (1987). Today, because of amendments made in 1991, a defendant's actual or intended use of the firearm plays no role in determining the Guideline range. Instead, prior criminal history and type of weapon are largely determinative. Moreover, under today's guidelines, a base offense level of 14, which is in Zone D, rarely allows a defendant to be sentenced to serve a non-prison term.

In 1989, the Commission increased the base offense level by 3 points, from 9 to 12, U.S.S.G. § 2K2.1(a) (1989), to reflect an increase in the statutory maximum penalty for unlawful firearm possession, which Congress doubled from 5 to 10 years in the Anti-Drug Abuse Act of 1988, *see* U.S.S.G. app. C, amend. 189, 100-101 (1989).

Then, in 1991, against the weight of empirical evidence collected from 1987 to 1990, the

Commission completely erased and replaced the firearms guidelines. Similar to the now-discredited drug guidelines, the Commission dramatically increased the penalties proscribed under § 2K2.1 "in light of the Congressional sanction of a minimum 15 years for a prohibited person with three prior felonies of violence or controlled substance offenses." 1990 Commission Report 19. To create a framework "proportional" to the ACCA, the Commission doubled the base offense level for a defendant with two prior crimes of violence or controlled substance offenses, from 12 to 24, effectively increasing the penalties prescribed for such defendants six-fold. *See id.* 19-23.

Since the Commission looked to the mandatory minimum ACCA sentence to create the firearm guidelines, and ignored "empirical data and national experience," the § 2K2.1 provisions "do not exemplify the Commission's exercise of its characteristic institutional role" or "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough*, 552 U.S. at 109 (internal quotation marks and citations omitted); *see also Gall*, 552 U.S. at 46 & n. 2. Instead, as demonstrated in this case, the Guidelines drastically overstate the seriousness of the offense by ignoring relevant considerations, such as Mr. Watkins' history and the need for society to have individuals like Mr. Watkins to successfully reenter society.

Like in *Gall*, "[a]ny term of imprisonment in this case would be counter effective by depriving society of the contributions of the Defendant who . . . understands the consequences of his criminal conduct and is doing everything in his power to forge a new life." 552 U.S. at 44 (citation omitted) (quoting district court). Mr. Watkins requests a sentence of twenty-one months, in order to begin the next stage of his life and to secure his productive place in the community. The requested sentence is not greater than necessary, and is sufficient for the purposes of sentencing.

**Conclusion**

A sentence of twenty two months followed by a term of supervised release is a serious

consequence that will more than adequately punish Mr. Watkins for his particular conduct and

will also adequately deter any future wrongful conduct.  Thus, for the reasons stated above,

including Mr. Watkins' history and characteristics, together with the other goals of sentencing,

Mr. Watkins respectfully requests that the Court impose such a sentence.


Respectfully submitted,


A.J. KRAMER
FEDERAL PUBLIC DEFENDER


_____/s/_____
EUGENE OHM
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500